# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| *United States of America* | Case No: 26-cr-00025-LMP-DLM |
| Plaintiff, | |
| v. | |
| *Nekima Valdez Levy-Armstrong et al.,* | |
| Defendants. | |

# DON LEMON AND GEORGIA FORT'S
# JOINT MOTION TO DISCLOSE GRAND JURY PROCEEDINGS

**Table of Contents**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

    A.    Mr. Lemon and Ms. Fort Attended the Protest at Cities Church as Journalists and the Video Footage of Their Protected Reporting Activities Speaks for Itself. ........................................................................ 2

    B.    The Government Tried and Failed to Secure Arrest Warrants for Mr. Lemon and Ms. Fort ............................................................................... 3

    C.    Pressure from President Trump and Main Justice to Bring Charges ............ 5

    D.    Main Justice Took Over When Career Local Prosecutors Refused Involvement .................................................................................. 8

ARGUMENT ................................................................................................... 10

I.    THE SUBSTANTIAL LIKELIHOOD THAT THE GOVERNMENT CARRIED GROSS MISREPRESENTATIONS OF MATERIAL ISSUES OF FACT AND LAW INTO THE GRAND JURY PROCEEDING WARRANTS DISCLOSURE OF GRAND JURY MATERIALS ....................... 12

    A.    Disclosure is Necessary to Avoid Injustice ................................. 12

    B.    The Need for Disclosure Outweighs the Interest in Grand Jury Secrecy ............................................................................... 18

    C.    The Request Covers Only Material Directly Pertinent to the Need for Disclosure ................................................................... 19

II.    THE GOVERNMENT IS NOT ENTITLED TO THE PRESUMPTION OF REGULARITY ......................................................................... 20

CONCLUSION ............................................................................................... 26

## Table of Authorities

**Cases**                                                                    **Page(s)**

*Abrego Garcia v. Noem*,
   2025 WL 1021113 (4th Cir. Apr. 7, 2025) ................................................................ 23

*Abrego Garcia v. Noem*,
   348 F.R.D. 594 (D. Md. 2025) .............................................................................. 24

*Am. Fed'n of Gov't Emps. v. Trump*,
   139 F.4th 1020 (9th Cir. 2025) ............................................................................. 24

*Am. Fed'n of Gov't Emps. v. Trump*,
   784 F. Supp. 3d 1316 (N.D. Cal. 2025) ............................................................ 24, 25

*Am. Fed'n of Gov't Emps. v. U.S. Off. of Pers. Mgmt.*,
   777 F. Supp. 3d 253 (S.D.N.Y. 2025) .................................................................... 24

*Associated Press v. Budowich*,
   780 F. Sup. 3d 32 (D.D.C. 2025) ......................................................................... 23

*Bank of Nova Scotia v. United States*,
   487 U.S. 250 (1988) .............................................................................................. 12

*CASA, Inc. v. Trump*,
   2025 WL 654902 (4th Cir. Feb. 28, 2025) ........................................................... 24

*Costello v. United States*,
   350 U.S. 359 (1956) .............................................................................................. 16

*In re Cudahy*,
   294 F.3d 947 (7th Cir. 2002) ................................................................................ 11

*D.B.U. v. Trump*,
   781 F. Supp. 3d 1158 (D. Colo. 2025) .................................................................. 24

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
   441 U.S. 211 (1979) ................................................................................... 11, 12, 19

*Fed. Educ. Ass'n v. Trump*,
   795 F. Supp. 3d 74 (D.D.C. 2025) .................................................................. 22, 23

*In re Grand Jury Investigation*,
   55 F.3d 350 (8th Cir. 1995) .................................................................................. 12

*In re Grand Jury Proceedings Relative to Perl*,
    838 F.2d 304 (8th Cir. 1988) ................................................................ 11, 19

*In re Grand Jury Subpoenas Duces Tecum*,
    904 F.2d 466 (8th Cir. 1990) ................................................................ 19, 20

*Grundmann v. Trump*,
    770 F. Supp. 3d 166 (D.D.C. 2025) ............................................................ 24

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
    2025 WL 1431263 (4th Cir. May 19, 2025) .................................................. 23

*Jenner & Block LLP v. U.S. Dep't of Just.*,
    784 F. Supp. 3d 76 (D.D.C. 2025) .............................................................. 24

*Jin v. Noem*,
    2025 WL 1358665 (D. Minn. Apr. 17, 2025) .............................................. 22, 24

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ............................................................ 24

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*,
    784 F. Supp. 3d 1 (D.D.C. 2025) ............................................................ 23, 24

*Maine v. U.S. Dep't of Agric.*,
    778 F. Supp. 3d 200 (D. Me. 2025) ............................................................ 24

*Minn. Bureau of Crim. Apprehension v. Noem et al.*,
    2026 WL 266463 (D. Minn. Feb. 2, 2026) .................................................... 21

*N.H Indonesian Cmty. Support v. Trump*,
    765 F. Supp. 3d 102 (D.N.H. 2025) ............................................................ 23

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    763 F. Supp. 3d 36 (D.D.C. 2025) .............................................................. 24

*Pacito v. Trump*,
    2025 WL 1295660 (W.D. Wa. May 5, 2025) ................................................ 23

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ............................................................ 23

*President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*,
    788 F. Supp. 3d 182 (D. Mass. 2025) ........................................................ 23

*Rona v. Trump*,
    797 F. Supp. 3d 278 (S.D.N.Y. 2025)....................................................................... 24

*In re Search of One Device and Two Individuals under Rule 41*,
    784 F. Supp. 3d 234 (D.D.C. 2025) ...................................................................... 23

*Taylor v. Minnesota*,
    2006 WL 2583150 (D. Minn. Sept. 7, 2006) ................................................. 14, 15

*United States v. Adams*,
    777 F. Supp. 3d 185 (S.D.N.Y. 2025)....................................................................... 23

*United States v. Alter*,
    482 F.2d 1016 (9th Cir. 1973) ...................................................................... 10

*United States v. Belton*,
    2015 WL 1815273 (N.D. Cal. Apr. 21, 2015) ................................................. 10, 11

*United States v. Broyles*,
    37 F.3d 1314 (8th Cir. 1994) ...................................................................... 11

*United States v. Calandra*,
    414 U.S. 338 (1974)...................................................................... 10

*United States v. Comey*,
    2025 WL 3202693 (E.D. Va. Nov. 17, 2025)..................................................... 15, 25

*United States v. Kouba*,
    822 F.2d 768 (8th Cir. 1987) ...................................................................... 20

*United States v. Kocher*,
    1992 WL 320979 (8th Cir. 1992) ............................................................... 12

*United States v. McDougal*,
    559 F.3d 837 (8th Cir. 2009) ................................................................. 18, 19

*United States v. Proctor & Gamble Co.*,
    356 U.S. 677 (1958)............................................................................ 10, 11

*United States v. Reed*,
    2018 WL 7504843 (D. Minn. Sept. 14, 2018)............................................... 12

*United States v. Rosen*,
    471 F. Supp. 2d 651 (E.D. Va. 2007) ....................................................... 11

*United States v. Stewart*,
  2025 WL 2754480 (D.D.C. Sept. 29, 2025) ................................................ 25

*United States v. Williams*,
  504 U.S. 36 (1992) ...................................................................................... 10

*United States v. Woody's Trucking, LLC*,
  2018 WL 457781 (D. Mont. Jan 17, 2018) .................................................. 10

*Widakuswara v. Lake*,
  779 F. Supp. 3d 10 (D.D.C. 2025) ............................................................... 24

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
  774 F. Supp. 3d 86 (D.D.C. 2025) ............................................................... 23

*Wood v. Georgia*,
  370 U.S. 375 (1962) ..................................................................................... 10

**Statutes and Constitutional Amendments**

18 U.S.C. § 241 .................................................................................................. 3

18 U.S.C. § 248 ..........................................................................................*passim*

U.S. Const amend. I ....................................................................... 8, 13, 14, 24

U.S. Const amend. V ......................................................................................... 10

**Other Authorities**

Fed. R. Crim. P. 6 ......................................................................................*passim*

Justice Manual § 9-11 ................................................................................. 16, 18

Sara Beale et al., *Grand Jury Law and Practice* § 5:6 (2d ed. 2001) .............. 11

Susan Brenner & Lori Shaw, *Federal Grand Jury: A Guide to Law and
  Practice* § 16:11 (2d ed. updated through Sept. 2025) ................................ 10

## INTRODUCTION

Grand jury proceedings are presumed regular and, with some exceptions, ordinarily protected from outside scrutiny.  But the government has squandered that presumption here.  Its conduct has been highly unusual, nakedly political, and inconsistent with practice in this District.  Multiple judges considered the government's "evidence" against Don Lemon and Georgia Fort and declined charges.  Undeterred, the government took the prosecution President Trump demanded to a grand jury and obtained an indictment.  These circumstances—never before seen in this District, and for good reason—raise serious concerns about the government's presentation to the grand jury.  To date, everything in this case has been irregular; we can assume the grand jury proceedings were too.

In the United States of America, we do not prosecute journalists for doing their job.  That happens in Russia, China, Iran and other authoritarian regimes.  And yet the government sold this unconstitutional mess to the grand jury.  Disclosure of the grand jury proceedings is necessary to ensure the government did not mislead or mis-instruct it.  Mr. Lemon and Ms. Fort move this Court under Federal Rule of Criminal Procedure 6(e) to order immediate disclosure of the entire transcript of the grand jury proceedings in this case.[1]

---

[1] On February 10, 2026, counsel for Mr. Lemon and Ms. Fort met and conferred by video with government counsel and advised of their intent to file this joint motion.  The government, through counsel, indicated they oppose this motion.

## FACTUAL BACKGROUND

### A. Mr. Lemon and Ms. Fort Attended the Protest at Cities Church as Journalists and the Video Footage of Their Protected Reporting Activities Speaks for Itself

Don Lemon has been a network and now a national, independent journalist for thirty years. Georgia Fort has been a radio and television and now an independent journalist for nearly 20 years. Both have won numerous awards for their reporting and are renowned in the journalistic community. In fact, Ms. Fort has sufficiently demonstrated her professionalism and journalistic integrity such that this Court has credentialed her to cover events in the very courtroom where the government seeks to prosecute her.

On January 18, 2026, in their capacities as journalists, both Mr. Lemon and Ms. Fort reported on a protest taking place at Cities Church in St. Paul, Minnesota. At no point did either engage in chanting or other behavior characteristic of protesting or activism. Mr. Lemon explicitly stated that he was there "chronicling and reporting. We're not a part of the activists, but we're here just reporting on them." Case No. 26-mj-00040-LMP-DLM, ECF 23-1 (D. Minn. Jan 20, 2026) (Aff. of DHS-ICE Special Agent Timothy M. Gerber) ("Gerber Aff.") ¶ 28. The indictment itself describes Ms. Fort as "interview[ing]" Ms. Armstrong: a quintessential journalistic function. ECF 39 at 12. That is confirmed by internal surveillance footage from the church, reviewed and relied on SA Gerber, in which Ms. Fort can be seen capturing the events using a professional-grade camera and microphone and livestreaming Mr. Lemon's interview of the Cities Church pastor.

## B. The Government Tried and Failed to Secure Arrest Warrants for Mr. Lemon and Ms. Fort

Two days after the Cities Church protest, the government filed a sealed criminal complaint seeking FACE Act and conspiracy charges against nine individuals, including Mr. Lemon and Ms. Fort, alleging violations of 18 U.S.C. §§ 241 and 248(a)(2). *See* Case No. 26-mj-00040-LMP-DLM, ECF 23 (Jan. 20, 2026) (redacted complaint). That day, this Court found that probable cause did not exist for either of the charges against Mr. Lemon, Ms. Fort, and three others, and found probable cause only for the Section 241 charge against Ms. Armstong, Ms. Allen, and Mr. Kelly. Notably, the Court found that no probable cause existed to charge Ms. Armstong, Ms. Allen, and Mr. Kelly for violations of Section 248(a)(2). *See* Case No. 26-mj-00040-LMP-DLM, ECF 2, 3, 4 (arrest warrants).

According to the government, on January 21, the government "offered to submit additional evidence to support the complaint" but the duty magistrate was not able to review the additional evidence on the expedited basis the government sought. *See In re United States of America*, No. 26-01135, Emergency Pet. for Writ of Mandamus ("Pet.") at 3 (8th Cir. Jan. 22, 2026). Unsatisfied, the government took the unprecedented step of asking the district court to review this Court's no-probable-cause determination. *Id.*, Pet. at 4. Chief Judge Patrick Schiltz was randomly assigned to the matter. *See id.*, First Letter from Chief Judge Schiltz to Chief Judge Colloton (Jan. 23, 2026) ("First Letter"). Chief Judge Schiltz surveyed every judge in the District of Minnesota and all Chief Judges of the Eighth Circuit and failed to identify a single instance where a district court judge reviewed

3

the decision of a magistrate judge to deny an arrest warrant. *See id.* at 2; *Id.*, Second Letter from Chief Judge Schiltz at 1 (Jan. 23, 2026) ("Second Letter").

Because of the unprecedented nature of the request, Chief Judge Schiltz informed the government that same day that he needed to discuss the issue with his colleagues at their bench conference on January 27. Finding that timeline for their unprecedented request to be unacceptable, the next day, the government filed an Emergency Petition for Writ of Mandamus or Issuance of Arrest Warrants in the Eighth Circuit and requested a ruling by January 23. *See* Pet. The petition made no additional arguments to support the issuance of the arrest warrants, beyond stating that the complaint established probable cause to charge each of the named defendants and citing various paragraphs of the complaint. *Id.* at 11–12.[2]

In his first letter response, which he noted was prepared without his having seen the petition for mandamus, Chief Judge Schiltz explained that the urgency of the government's request was unfounded and that if government disagreed with the Court's no-probable-cause decision, it could always "improve the affidavit and present it again to the same magistrate judge." First Letter at 2. The Chief Judge added that the government's argument amounted to little more than "I must accept this as true because they said it, and they are the government." *Id.* at 3. In his second letter to the Eighth Circuit, Chief Judge Schiltz addressed the government's failure to establish probable cause even more directly, writing:

> The government lumps all eight protestors together and says things that are true of some but not all of them. Two of the five protestors were not

---

[2] The government also did not inform the Chief Judge that they were filing the Petition for Writ of Mandamus, nor did they provide him with a copy of the pleading. First Letter at 1.

protestors at all; instead, they were a journalist and his producer.  There is
no evidence that those two engaged in any criminal behavior or conspiracy
to do so.

Second Letter at 1.[3]  Chief Judge Schiltz also added:

The government does not explain why the arrests of five more people – one
of whom is a journalist and the other his producer – would make Cities
Church any safer, especially because that would still leave "dozens" of those
who invaded the church on Sunday free to do it again.

*Id.* at 1–2.  That same day, the government filed its Reply, acknowledging that Chief Judge

Schiltz "has already considered whether the complaint establishes probable cause, at

minimum for two of the five remaining charged individuals."  *In re United States of

America*, No. 26-01135, Reply in Support of Emergency Petition for Writ of Mandamus

(8th Cir. Jan. 23, 2026).  The government, though, failed to explain why the arrests of five

others would create any deterrent effect or resolve any danger-to-the-community concerns.

The Eighth Circuit denied the Emergency Petition, *id.*, Judgment (Jan. 23, 2026), and the

government formally withdrew its request for Chief Judge Schiltz to reconsider the five

arrest warrants previously rejected by this Court.  *See* Case No. 26-mj-00040-LMP-DLM,

ECF 33 (Jan. 26, 2026).

But that did not end the government's pursuit.

### C. Pressure from President Trump and Main Justice to Bring Charges

The above-described extraordinary requests were not happening in a vacuum.

Rather, the government's frantic and unprecedented legal maneuvers were occurring as

---

[3] Although Chief Judge Schiltz was referring to Mr. Lemon, Ms. Fort stands in the same
shoes and the reasoning applies to her with equal force.

President Trump and senior Administration officials were publicly calling for charges against Mr. Lemon and others. They were doing so using hyperbolic and conclusory language that could leave no prosecutor uncertain as to their desired outcome.

On the day the government initially sought arrest warrants for Mr. Lemon and Ms. Fort, President Trump politicized the protest at Cities Church—and Mr. Lemon specifically—at two separate events. First, during a January 20, 2026 press conference at the White House, President Trump stated:

> And they have to be abused by guys like Don Lemon, who's a, you know, loser, lightweight. I saw him, the way he walked in that church. It was terrible. I have such respect for that pastor. He was so calm. He was so nice. He was just accosted. What they did in that church was horrible yesterday.[4]

Then, during an interview the same day with Katie Pavlich of NewsNation, he stated:

> And then you have the agitators, anarchists, you know, I watch sort of everything, I see it all. And I see people, screaming, "Shame, shame," you know. This is not people that are like living in Minnesota, these are professional paid people, they're like actors. I mean, I watched the guy last night in the church, he was, and not just Don Lemon, Don Lemon's a loser, but I watched a guy last night in the church. This guy's a professional guy and he, he actually admits to it, he gets paid a lot of money to go and cause trouble.[5]

At the same time, Attorney General Pamela Bondi was also publicly pushing for charges against Mr. Lemon and others who were at Cities Church, stating, "We are coming after you if you participated in that. I don't care if you're a failed CNN journalist, you have

---

[4] *Press Conference: Donald Trump Leads the Press Briefing at the White House* (Jan. 20, 2026), https://perma.cc/PVH5-HYL6.

[5] Katie Pavlich of NewsNation Interviews Donald Trump at the White House (Jan. 20, 2026), https://perma.cc/DS5M-22VE.

no right to do that in this country. We don't live in a third world country."[6]  Attorney General Bondi rejected the premise that Mr. Lemon is an independent journalist, instead calling him "an online agitator," while acknowledging that "if you are a journalist and you are covering a story" that may factor into the legal analysis.[7]  Similarly, when asked about Mr. Lemon on Fox News, Deputy Attorney General Todd Blanche stated "freedom of the press extends to a lot of different areas, but it does not extend to somebody just trespassing and being embedded with a group of rioters."[8]

Perhaps most notably, President Trump's pick to lead the Justice Department's Civil Rights Division, Assistant Attorney General (AAG) Harmeet Dhillon, sat for an extensive interview to discuss the matter, while the Eighth Circuit was considering the Emergency Petition for Mandamus.  In relevant part, AAG Dhillon explained:

> [Don Lemon] is not out of legal jeopardy, and he has lawyered up . . . .  We're gonna pursue this to the ends of the earth. [9]
>
> . . .
>
> The attorney general herself was there on the ground and managing this process with my principal deputy, a brilliant young lawyer. And so you know we are not giving up the fight here at all[.][10]
>
> . . .

---

[6] @DerrickEvans4WV, X (Jan. 24, 2026, 8:37 AM), https://x.com/DerrickEvans4WV/status/2015056472447897820.

[7] *Id.*

[8] *Deputy AG Todd Blanche says authorities are investigating MN church storming 'aggressively'*, Fox News (Jan. 19, 2026), https://www.foxnews.com/video/6387960831112, at 3:28–3:37.

[9] *The DOJ WILL Continue Pushing For Criminal Charges Against Don Lemon, Reveals Harmeet Dhillon*, The Megyn Kelly Show (Jan. 23, 2026), https://www.youtube.com/watch?v=4i5xhWd2o2w, at 1:54–2:06.

[10] *Id.* at 5:06–5:18.

Abbe Lowell, his lawyer, had nothing to do with the magistrate judge refusing to sign off on arresting Don Lemon. So you have to understand that we at the Department of Justice, these days, in the most aggressive and important fights that we're facing, we're kind of out-manned two against one. You know, he didn't even need a lawyer. The magistrate judge was kind of standing in as judge and jury.[11]

In yet another statement, AAG Dhillon denounced Mr. Lemon's reporting as "pseudo journalism" unworthy of First Amendment protection.[12]

These statements by President Trump, Attorney General Bondi, Deputy Attorney General Blanche, and AAG Dhillon all occurred while the government was actively and furiously seeking reconsideration of the Court's refusal to issue the arrest warrants from the duty magistrate, the Chief Judge of the District of Minnesota, and the Eighth Circuit.

### D. Main Justice Took Over When Career Local Prosecutors Refused Involvement

As with other presidentially-demanded prosecutions during the second Trump Administration, according to media reports, career prosecutors from the Minnesota U.S. Attorney's Office (and later, from the Central District of California, where Mr. Lemon was arrested) refused to participate in this case because the facts and evidence did not support the charges.[13]  As a result, Main Justice took over prosecuting the case—specifically, the

---

[11] *Don Lemon's Outrageous "N Word Treatment" Comment and Promises WAY More Arrests, w/ Harmeet Dhillon*, The Megyn Kelly Show (Jan. 23, 2026), https://www.youtube.com/watch?v=ylRbkf2umF8, at 1:57–2:23.

[12] @AAGDhillon, X (Jan. 18, 2026, 7:21 PM), https://x.com/AAGDhillon/status/2013044166062936417.

[13] *See* Katy Tur, *Multiple prosecutors in Minn. and L.A. refused to be involved in Don Lemon charges, sources say*, MS Now (Jan. 30, 2026), https://www.ms.now/katy-tur/watch/sources-multiple-prosecutors-in-minn-and-l-a-refused-to-be-involved-in-don-lemon-charges-2484495427995.

Civil Rights Division led by AAG Dhillon, who had already made clear her intent to pursue the case at all costs. The Attorney General, this time joined by AAG Dhillon, returned to the Minnesota U.S. Attorney's Office on January 28, the day before the case was brought before the grand jury.[14] The resulting two-count felony indictment, returned on January 29, does not bear the name of a single line prosecutor from this District's U.S. Attorney's Office. That is irregular and represents an unusual departure from the many years' collaboration between the Minnesota U.S. Attorney's Office and the Civil Rights Division throughout multiple administrations, particularly in civil rights cases and cases that are notable in the Minnesota community.[15]

---

[14] @AGPamBondi, X (Jan. 28, 2026, 5:49 PM), https://x.com/AGPamBondi/status/2016644788586455357.

[15] *See, e.g.*, Press Release, *Joint Statement of the United States Attorney for the District of Minnesota Andrew M. Luger, Assistant Attorney General for Civil Rights Vanita Gupta and Special Agent in Charge of the Minneapolis Division of the FBI Richard T. Thornton* (Nov. 17, 2015), https://www.justice.gov/usao-mn/pr/joint-statement-united-states-attorney-district-minnesota-andrew-m-luger-assistant; Press Release, *Three Illinois Men Indicted On Federal Civil Rights And Hate Crime Violations In The Bombing Of Bloomington, Minnesota, Islamic Center* (June 12, 2018), https://www.justice.gov/usao-mn/pr/three-illinois-men-indicted-federal-civil-rights-and-hate-crime-violations-bombing; Press Release, *Justice Department Files Sexual Harassment Lawsuit Against Owners Of Minneapolis Area Rental Properties* (Sept. 16, 2020), https://www.justice.gov/usao-mn/pr/justice-department-files-sexual-harassment-lawsuit-against-owners-minneapolis-area-rental; Press Release, *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd* (Feb. 24, 2022), https://www.justice.gov/archives/opa/pr/three-former-minneapolis-police-officers-convicted-federal-civil-rights-violations-death; Press Release, *Justice Department Finds Civil Rights Violations by the Minneapolis Police Department and the City of Minneapolis* (June 16, 2023), https://www.justice.gov/archives/opa/pr/justice-department-finds-civil-rights-violations-minneapolis-police-department-and-city; Press Release, *Justice Department Secures Landmark Agreement with City of Anoka, Minnesota, to End Disability Discrimination in "Crime-Free" Housing Program* (May 21, 2024),

## ARGUMENT

The grand jury is a check against unfounded prosecution—a bulwark between the accuser and the accused.    *See Wood v. Georgia*, 370 U.S. 375, 390 (1962).    "[T]he Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury'" in order to "protect[] citizens against arbitrary and oppressive governmental action."    *United States v. Calandra*, 414 U.S. 338, 343 (1974).  To that end, defendants have a constitutional right to "an independent and informed grand jury," *United States v. Williams*, 504 U.S. 36, 51 (1992), whose function is not only to determine whether probable cause exists to charge an offense, but also to protect from prosecution those for whom criminal charges are unfounded.  *Calandra*, 414 U.S. at 343.

Under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), a court may order the disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).[16]  While there is a "long-established policy that

---

https://www.justice.gov/archives/opa/pr/justice-department-secures-landmark-agreement-city-anoka-minnesota-end-disability.

[16] Unlike the *substance* of grand jury proceedings, a prosecutor's introductory remarks and legal instructions provided to the grand jury are not presumptively covered by Rule 6(e)'s secrecy requirement and "does not require a particularized need."  *United States v. Woody's Trucking, LLC*, 2018 WL 457781, at *1 (D. Mont. Jan 17, 2018) (citing *United States v. Alter*, 482 F.2d 1016, 1029 n. 21 (9th Cir. 1973)).  Commentators have noted that grand jury secrecy "does not govern matters such as a court's charge to a grand jury."  Susan Brenner & Lori Shaw, *Federal Grand Jury: A Guide to Law and Practice* § 16:11 (2d ed. updated through Sept. 2025). "The legal instructions given to the grand jury regarding the charges on which they are deliberating are a part of the 'ground rules' by which the grand jury conducts its proceedings. The instructions do not reveal the substance of the grand

maintains the secrecy of the grand jury proceedings," *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 (1958), courts may order disclosure of grand jury transcripts under Rule 6(e)(3)(E)(ii) when defendants establish a "particularized need" that outweighs the interest in maintaining grand jury secrecy. *United States v. Broyles*, 37 F.3d 1314, 1318 (8th Cir. 1994) (citing *Procter & Gamble*, 356 U.S. at 683).

The "particularized need" standard is met upon a showing that (1) the material sought "is needed to avoid a possible injustice in another judicial proceeding," (2) "the need for disclosure is greater than the need for continued secrecy," and (3) the "request is structured to cover only material so needed." *In re Grand Jury Proceedings Relative to Perl*, 838 F.2d 304, 306 (8th Cir. 1988) ("*In re Perl*") (quoting *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979)). Mr. Lemon and Ms. Fort have more than overcome that threshold here, as discussed below.

---

jury's deliberative process or other information that would compromise the secrecy that Rule 6 seeks to protect." *United States v. Belton*, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015); *see also In re Cudahy*, 294 F.3d 947, 951 (7th Cir. 2002) (Posner, J.) ("[M]inisterial grand jury records, such as records reflecting the empaneling and extension of the grand jury, are not within the reach of Rule 6(e) because they reveal nothing of substance about the grand jury's investigation." (quoting 1 Sara Beale et al., *Grand Jury Law and Practice* § 5:6 (2d ed. 2001)). Rule 6(e) applies to the *substance* of jury deliberations, the identity of grand jurors or expected witnesses, or evidence that is actually presented to the jury—not the basic ground rules by which the grand jury conducts its proceedings. *See United States v. Rosen*, 471 F. Supp. 2d 651, 655 (E.D. Va. 2007). Accordingly, the Court should order their disclosure to Defendants in this case.

I.   **THE SUBSTANTIAL LIKELIHOOD THAT THE GOVERNMENT CARRIED GROSS MISREPRESENTATIONS OF MATERIAL ISSUES OF FACT AND LAW INTO THE GRAND JURY PROCEEDING WARRANTS DISCLOSURE OF GRAND JURY MATERIALS**

### A. Disclosure Is Necessary to Avoid Injustice

The extraordinary set of events that led to this indictment reveals a significant risk that the government misstated key facts[17] or elements of the offenses charged during its presentation to the grand jury, as it has already done so publicly, calling into question the validity of the indictment.  Rule 6(e) permits disclosure when "needed to avoid a possible injustice in another judicial proceeding."  *Douglas Oil*, 441 U.S. at 222; *see In re Grand Jury Investigation*, 55 F.3d 350, 354 (8th Cir. 1995).  Mr. Lemon and Ms. Fort seek disclosure of the grand jury transcripts to determine if the grand jury's probable cause determination was based on the same inaccurate or misleading representations that the government has rendered publicly, which would cast "'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).

The request is not "merely [] a "'fishing expedition.'"  *United States v. Reed*, 2018 WL 7504843, at *3 (D. Minn. Sept. 14, 2018) (quoting *United States v. Kocher*, 1992 WL 320979 (8th Cir. 1992)).  The risk that inaccurate and/or misleading information was

---

[17] There are other astonishing examples of the Administration making or presenting false statements and information in this and other proceedings that should deeply trouble the Court and demonstrate that this case is anything but "business as usual."  Notably, the White House official social media account posted a photograph of Nekima Levy Armstrong that was doctored to change her appearance—to darken the color of her skin and to doctor her face to make it appear as if she was crying.  *See* @WhiteHouse, X (Jan. 22, 2026, 10:54 AM), https://x.com/WhiteHouse/status/2014365986388951194.

presented to the grand jury is substantiated by the fact that Justice Department officials have made repeated public assertions about this case that contain fundamental misstatements of the law. More specifically, the same DOJ personnel in charge of this case have articulated views about purported criminal liability by journalists that are squarely at odds with the FACE Act itself. *See supra* at 5–9. In fact, AAG Dhillon, in interview discussing the indictment in this case, wholly mischaracterized the law as it relates to journalistic activities:

> [I]n my opinion, in a private property house of God, church, synagogue, mosque, whatever, there is only one paramount First Amendment right there, and that's the right to freely worship. The right to assemble, the right to protest, freedom of the press, etcetera—those have time, place, and manner restrictions on them—you can't just do anything you want anywhere, even on public property. So here, it's just like doing it in somebody's house or in somebody's business. It's not protected by the law. *If you wear the badge "journalist" or you claim, "I've got a microphone, I'm a journalist," that is legally irrelevant in the statute.*[18]

Rather than being "legally irrelevant in the statute," Congress expressly limited the FACE Act so that protected First Amendment expression cannot form the basis of criminal liability. The FACE Act's rules of statutory construction in 18 U.S.C. § 248, subsection (d) are clear: "[n]othing in this section shall be construed" "to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution," or "to create new remedies for interference with activities protected by the free speech or free exercise clauses of the

---

[18] @AAGDhillon, X (Feb. 3, 2026),
https://x.com/AAGDhillon/status/2018710583290315193, at 0:04–0:42 (emphasis added).

First Amendment to the Constitution, occurring outside a facility, regardless of the point of view expressed, or to limit any existing legal remedies for such interference." The uncontested existing evidence demonstrates that Mr. Lemon and Ms. Fort were engaged in constitutionally protected conduct, including newsgathering, observing, recording, and reporting.[19]

Mr. Lemon and Ms. Fort were indicted under the FACE Act, despite attending the protest solely in their capacities as members of the press. As such, there is a particularly heightened need for the Court and the defendants to know how the government described for grand jurors the basis to indict journalists—who were only engaged in constitutionally protected activity as the video evidence shows.[20] The failure of the government to inform the grand jury on this crucial statutory limitation is an invitation from the government to indict conduct that is not criminal *as a matter of law*, which would cause "grave doubt that the decision to indict was free from the substantial influence of the alleged procedural or

---

[19] Although Fort is not the household name that Lemon is, the government knew she was operating as a journalist, including because the indictment notes that she was conducting an interview outside of the church. *See* ECF 39 ¶ 8 (Overt Act #29).

[20] This would not be the first time this Administration failed to accurately state the law as related to journalistic activities. Less than two weeks ago, DOJ failed to inform a magistrate judge about a law that prevents the search and seizure of journalistic work product or documentary materials in its warrant application to search Washington Post reporter Hannah Natanson's home, vehicle, and electronics. *In re Search of the Real Property and Premises of Hannah Natanson*, No. 26-sw-54, ECF 39 (E.D. Va. Jan. 30, 2026); *see* Charlie Savage, *U.S. Failed to Alert Judge to Press Law in Application to Search Reporter's Home*, NY Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/doj-press-law-warrant-application-washington-post-journalist.html.

technical violation," warranting dismissal. *Taylor v. Minnesota*, 2006 WL 2583150, at *11 (D. Minn. Sept. 7, 2006).

This concern about misstatements to the grand jury are not abstract or speculative. Indeed, they are consistent with a small but growing body of caselaw involving the precise situation we see here—the government engaging in highly unusual conduct simultaneous to political pressure to bring charges, and misstatements of law at the highest levels of government. In November 2025, a federal magistrate judge in the Eastern District of Virginia granted former FBI Director James Comey the same relief sought here: access to grand jury materials, including the transcript of grand jury proceedings when no witness was present, from the indictment that had been returned against him. *See United States v. Comey*, -- F. Supp. 3d ---, 2025 WL 3202693, at *12 (E.D. Va. Nov. 17, 2025). The court's reasoning in *Comey* applies with equal force to Mr. Lemon and Ms. Fort, including the court's concerns that "statements by the prosecutor to the grand jurors that on their face *appear to be fundamental misstatements of the law* that could compromise the integrity of the grand jury process." *Id.* at *7 (emphasis added.) As that court concluded, when the government may have misstated the law to the grand jury and thereby allowed corruption of the probable-cause assessment, the defense is entitled to examine what was said and how the law was presented. So too here.

Disclosure of the grand jury transcripts to Mr. Lemon and Ms. Fort would reveal as much, including whether the government presented the grand jury with unfounded charges based upon an improper framing of what the FACE Act criminalizes. As the government should know well, the Justice Manual cautions that a "prosecutor must recognize that the

grand jury is an independent body, whose functions include not only the investigation of crime and the initiation of criminal prosecution but also the *protection of the citizenry from unfounded criminal charges*." Justice Manual § 9-11.010 (emphasis added). It further states that "[t]he grand jury's power, although expansive, is limited by its function toward possible return of an indictment." *Id.* § 9-11.120 (citing *Costello v. United States*, 350 U.S. 359, 362 (1956)). Two former federal prosecutors with nearly forty years' combined experience in this District recently framed these mounting concerns about the grand jury process well, saying:

> Unfortunately, recent actions by the DOJ demonstrate that the DOJ is wrongfully using the grand jury as a tool in its campaign of retribution and intimidation. We are particularly concerned about reports that federal prosecutors may be intentionally misrepresenting the correct legal standards and circumventing legal procedures, stripping the grand jury of its deliberative function . . . The American public must have confidence that the grand jury remains an independent body of citizens, not an "illegitimate" extension of the executive branch, seeking to gloss over unconstitutional actions by government actors. It is the duty of any person summoned to serve on a grand jury to preserve the grand jury's independence by applying the law, not rubber-stamping government overreach.[21]

Mr. Lemon and Ms. Fort are not alone in pointing to the government's flawed formulation of the law and the facts. This case has an extraordinary and singular procedural history, which includes two judges (including the Chief Judge) in the District of Minnesota reaching the same conclusion: no probable cause existed to charge Mr. Lemon and Ms. Fort with the *exact* same charges as those brought in the indictment. *See supra* at 3–5. Mr.

---

[21] John Marti & Hank Shea, *The last line of defense: We the people as a check on government power*, Minn. Star Trib. (Feb. 10, 2026), https://www.startribune.com/constitution-democracy-founding-fathers-government-amendment-jury/601579837.

Lemon's conduct and livestream of the events were the primary focus of 27 of the 40 "facts establishing probable cause" paragraphs in the original complaint affidavit, Case No. 26-mj-00040-LMP-DLM, ECF 23 (Jan. 20, 2026) (redacted Gerber Aff.), highlighting the fact that even though Mr. Lemon was clearly the primary focus of the affidavit, both this Court and Chief Judge Schiltz still found that no probable cause existed to bring the charges the government sought, and eventually obtained by grand jury indictment.

Meanwhile, the Gerber Affidavit seemingly contained only two allegations regarding Ms. Fort's supposed conduct:

> 33. Other video footage shows that, at this point during the incident, the pastor appears to be cornered by [REDACTED], [REDACTED], [REDACTED], and other unidentified agitators.[22]

> 37. Cities Church broadcast video also showed [REDACTED] present at the protest. A review of open-source social media videos showed [REDACTED] live-streaming the protest, in addition to interviewing ARMSTRONG and the pastor. [REDACTED], [REDACTED], [REDACTED] and other agitators were later seen intimidating and obstructing the pastor's freedom of movement, as noted above.

Gerber Aff. ¶¶ 33, 37. While it is possible that the government developed and presented additional evidence to the grand jury, the record in front of this Court belies that notion; while the government went to extraordinary and unprecedented measures to obtain a complaint against Mr. Lemon and Ms. Fort, when invited by the Chief Judge to simply provide additional evidence to support the charges, they did not.

---

[22] As is clear from the footage of the events, Mr. Lemon was interviewing the pastor at the time, which Ms. Fort was actively livestreaming.

Indeed, the allegations about Mr. Lemon and Ms. Fort in the grand jury indictment mirror almost exactly the allegations about them in the original affidavit for which no probable cause was found to exist. *Compare,* Gerber Aff. ¶¶ 9–10, *with* Indictment Overt Act #6; Gerber Aff. ¶ 30, *with* Indictment Overt Act #22; *compare* Gerber Aff. ¶ 37, *with* Indictment Overt Act #23. This further underscores the concerns that this indictment is a direct result of the same types of misleading and/or inaccurate statements of law to the grand jury that those in charge of this prosecution made in the media. *See also* Justice Manual § 9-11.233 (prosecutor obligated to present or disclose to grand jury evidence that directly negates negating guilt of subject of the investigation before seeking an indictment). It is apparent that the government is persisting in a view of criminal liability under the FACE Act that does not square with the facts or the law, as this Court has already found. Disclosure of grand jury transcripts is necessary to avoid injustice.

## B. The Need for Disclosure Outweighs the Interest in Grand Jury Secrecy

The need for disclosure in this particular case is greater than any possible public interest in preserving grand jury secrecy. Given the circumstances of the case to this point, the public interest in disclosure *is itself* grounds to grant this motion. Mr. Lemon and Ms. Fort's concerns about misstatements of law or fact, supported by specific evidence of prosecutorial overreach outside of the courtroom, could not be resolved by any remedy other than disclosure of the grand jury transcripts. *See, e.g., United States v. McDougal*, 559 F.3d 837, 841 (8th Cir. 2009) (noting defendant could have remedied their concern without disclosure of grand jury materials by "fil[ing] a motion challenging the original

sealing order").  Mr. Lemon and Ms. Fort's particular concerns about the statements made by prosecutors when no witness was present—something which could not be cured by cross-examination, *Brady/Giglio* protections, or discovery—weigh heavily in favor of disclosure.

Additionally, because the indictment has already been issued, "the interests in grand jury secrecy are reduced, although not eliminated" now that "the grand jury has ended its investigation."  *In re Perl*, 838 F.2d at 307.  In other words, general notions of grand jury secrecy—typically present in your run-of-the-mill case, which this is decidedly not—are far outweighed here by (1) Mr. Lemon and Ms. Fort's grave concerns about *prosecutors'* statements to the grand jury that cannot be cured by alternative means and (2) the reduced interest in grand jury secrecy because the indictment has issued and the grand jury's investigation is concluded.

### C.  The Request Covers Only Material Directly Pertinent to the Need for Disclosure

The nature of Mr. Lemon and Ms. Fort's particularized need renders all grand jury transcripts "directly pertinent to the need for disclosure."  *Douglas Oil*, 441 U.S. at 224. When the potential prosecutorial overreach involves statements to the grand jury, particularly those made in the absence of any witnesses, there is no meaningful way to further narrow the request without depriving Mr. Lemon and Ms. Fort of the transcripts necessary to determine whether misleading or inaccurate statements of law and/or fact were made and whether they undermined the grand jury's independence.  *See In re Perl*, 838 F.2d at 306–07 (requiring tailoring of the request but recognizing that the requisite particularized

need "varies with the circumstances of each case"); *see generally In re Grand Jury Subpoenas Duces Tecum,* 904 F.2d 466, 468 (8th Cir. 1990) (the decision to order disclosure of grand jury materials is left "to the sound discretion of the district court."). Here, because any possible misconduct arises from potential statements by government counsel that could only be revealed through the grand jury transcripts themselves, the request for all grand jury transcripts is the minimum necessary to identify and assess that alleged overreach and is not an untethered fishing expedition.  Accordingly, the scope of the request is grounded in the particularized need articulated above.

## II.    THE GOVERNMENT IS NOT ENTITLED TO THE PRESUMPTION OF REGULARITY

While grand jury proceedings have historically been "afforded a strong presumption of regularity," *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987), the government is not entitled to such a presumption here.  To the contrary, the record before this Court paints a picture of stunning and unremitting irregularity in this case.  As described by Chief Judge Schiltz, when the government sought the extraordinary remedy of a writ of mandamus to order the District of Minnesota to issue arrest warrants the Court had previously rejected for lack of probable cause, Chief Judge Schiltz characterized the government's request as "unheard of in our district or, as best I can tell, any other district in the Eighth Circuit."  First Letter at 2.  Chief Judge Schiltz noted that the government had not even granted him "the courtesy to tell me that they would be filing such a petition, nor did the United States serve the petition on" him, and further that the arguments advanced by the government were tantamount to stating that the Court "must accept [its] as true

because they said it, and they are the government." *Id*. at 1, 3.  Nor should the Court ignore the context in which these extraordinary legal maneuvers occurred—the President, Attorney General, Deputy Attorney General, and Assistant Attorney General for Civil Rights demanding these prosecutions; engaging in blatant politicization and name calling; misstatements of law; and the Administration posting doctored photos of defendants online. In a case where everything is irregular and troubling, and where local career prosecutors refused to participate, the government is not entitled to a presumption of regularity as to the grand jury proceedings.

Just last week, in this District, a court concluded that "Plaintiffs rebutted the 'presumption of regularity' that ordinarily attends public officials' actions" in a case against federal agencies possessing evidence collected from the scene of Alex Pretti's death. *Minn. Bureau of Crim. Apprehension v. Noem et al*., 2026 WL 266463, at *7 (D. Minn. Feb. 2, 2026).  And in the wake of Operation Metro Surge, courts in this District have increasingly signaled that the government, under the direction of this Administration, is no longer operating in a manner entitled to any presumption of regularity.  As Chief Judge Schiltz recently explained:

> Attached to this order is an appendix that identifies 96 court orders that ICE has violated in 74 cases.  The extent of ICE's noncompliance is almost certainly substantially understated.  This list is confined to orders issued since January 1, 2026, and the list was hurriedly compiled by extraordinarily busy judges. … *This list should give pause to anyone … who cares about the rule of law.  ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence*. … ICE is not a law unto itself.

*Tobay Robles v. Noem et al.*, No. 26-CV-0107-PJS-DLM, ECF 10 at 2–3 (D. Minn. Jan. 28, 2026) (emphases added); *id.*, ECF 7 at 3 (Jan. 26, 2026) (ordering "the head of a federal agency to personally appear," noting that this "is an extraordinary step" but that "the extent of ICE's violation of court orders is likewise extraordinary").

More broadly, federal judges in this District are facing a growing onslaught of unlawful and irregular practices wrought by the senior levels of the federal government. *See Patin Arevalo v. Bondi et al.*, No. 26-CV-0396-LMP-JFD, ECF 8 at 3 (D. Minn. Jan. 23, 2026) ("In what is fast becoming a disturbing trend, the Government has yet again violated (and is continuing to violate)" court orders.); *Jin v. Noem et al.*, No. 25-CV-1391-PJS-DLM, ECF 13 at 6 (D. Minn. Apr. 17, 2025) ("[T]he Court cannot imagine how the public interest might be served by permitting federal officials to flaunt the very laws that they have sworn to enforce."); *Moreta Duran v. Bondi et al.*, No. 25-CV-4816-MJD-JFD, ECF 11 at 3 (D. Minn. Jan. 25, 2026) (finding the Government's tactics "disturbing" and part of "an undeniable move by the Government in the past month to defy court orders or at least to stretch the legal process to the breaking point in an attempt to deny noncitizens their due process rights"); *Duton Bueno  v. Noem et al.*, No. 26-CV-0588-DWF-DJF, ECF 8 at 4 n.1 (D. Minn. Jan. 28, 2026) (finding that ICE's "deeply concerning" practice of racing detainees elsewhere to avoid due process in Minnesota federal courts "generally suggest[s] that ICE is attempting to hide the location of detainees").  Suffice it to say, these are not ordinary or "regular" times.

The pattern is apparent nationwide, too, as one court recently described: while "[g]enerations of presidential administrations and public officials have validated this

underlying premise of the presumption of regularity," "[i]n just six months, the President

of the United States may have forfeited the right to such a presumption" entirely.  *Fed.*

*Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90–92 (D.D.C. 2025),[23] *appeal docketed*, No.

---

[23] Cited in the order for support were the following decisions: *see, e.g.*, *J.O.P. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1431263, at *10 (4th Cir. May 19, 2025) (Gregory, J., concurring) ("As is becoming far too common, we are confronted again with the efforts of the Executive Branch to set aside the rule of law in pursuit of its goals. It is the duty of courts to stand as a bulwark against the political tides that seek to override constitutional protections and fundamental principles of law, even in the name of noble ends like public safety."); *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 205 (D. Mass. 2025) ("[T]he Court will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face."), *appeal docketed*, No. 25-1627 (1st Cir. July 1, 2025); *In re Search of One Device and Two Individuals under Rule 41*, 784 F. Supp. 3d 234, 244 n.10 (D.D.C. 2025) ("Blind deference to the government? That is no longer a thing. Trust that had been earned over generations has been lost in weeks. Numerous career prosecutors have had to resign instead of taking actions that they believe violated their oath of office, or worse, were fired for upholding that oath."); *Washington v. Trump*, No. 25-0127 (JCC), ECF No. 53 at 13:13-15 (W.D. Wash. Jan. 24, 2025) ("I've been on the bench for over four decades. I can't remember another case where the question presented was as clear as this one is. This is a blatantly unconstitutional order."); *N.H Indonesian Cmty. Support v. Trump*, 765 F. Supp. 3d 102, 109 (D.N.H. 2025) ("[T]he Executive Order contradicts the text of the Fourteenth Amendment and the century-old untouched precedent that interprets it."); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue here is clear from its face . . . ."); *Pacito v. Trump*, 2025 WL 1295660, at *7 (W.D. Wa. May 5, 2025) ("The Government's interpretation is, to put it mildly, 'interpretive jiggery-pokery' of the highest order. It requires not just reading between the lines, but hallucinating new text that simply is not there." (cleaned up)); *Associated Press v. Budowich*, 780 F. Sup. 3d 32, 49 (D.D.C. 2025) ("Indeed, the Government has been brazen about this."); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 120 (D.D.C. 2025) ("In a cringe-worthy twist on the theatrical phrase 'Let's kill all the lawyers,' EO 14230 takes the approach of 'Let's kill the lawyers I don't like,' sending the clear message: lawyers must stick to the party line, or else."), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025); *Abrego Garcia v. Noem*, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025) ("[T]his is a path of perfect lawlessness, one that courts cannot condone.") (Wilkinson, J., concurring); *United States v. Adams*, 777 F. Supp. 3d 185, 192 (S.D.N.Y. 2025) (The implication "that public officials may receive special dispensation if they are compliant with the incumbent administration's policy priorities . . . is fundamentally incompatible with the basic promise of equal justice under

law."); *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 49 (D.D.C. 2025) ("To hold otherwise would be to bless the President's obvious attempt to exercise power beyond that granted to him by the Constitution and shield the Executive Branch's counterterrorism actions from independent oversight, public scrutiny, and bipartisan congressional insight regarding those actions."); *D.B.U. v. Trump*, 781 F. Supp. 3d 1158, 1168 (D. Colo. 2025) ("This sentence [in the government's brief] staggers. It is wrong as a matter of law and attempts to read an entire provision out of the Constitution."), *appeal docketed*, No. 25-1265 (10th Cir. July 8, 2025); *Jin v. Noem*, 2025 WL 1358665, at *2 (D. Minn. Apr. 17, 2025) ("[T]he Court cannot imagine how the public interest might be served by permitting federal officials to flaunt the very laws that they have sworn to enforce."); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 35 (D.D.C. 2025) ("[The defendants] took immediate and drastic action to slash [United States Agency for Global Media], without considering its statutorily or constitutionally required functions as required by the plain language of the [executive order], and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world. It is hard to fathom a more straightforward display of arbitrary and capricious actions than the Defendants' actions here."), *appeal docketed*, No. 25-5144 (D.C. Cir. Apr. 24, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 99 (D.D.C. 2025) ("In short, the order raises constitutional eyebrows many times over."), *appeal docketed*, No. 25-5265 (D.C. Cir. July 22, 2025); *Abrego Garcia v. Noem*, 348 F.R.D. 594, 601 (D. Md. 2025) ("Defendants have failed to respond in good faith, and their refusal to do so can only be viewed as willful and intentional noncompliance."); *Maine v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 200, 231-32 (D. Me. 2025) ("[The law] imposes numerous steps an agency must take before refusing or terminating funding for noncompliance . . . . [T]he factual record does not indicate the Federal Defendants took any of these actions before freezing Maine's federal funds . . . ."); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 184 (D.D.C. 2025) ("This argument fails to persuade because it misconceives (and in one instance misrepresents) the Executive Order, Plaintiffs' claims, the law, and the facts."); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 50 (D.D.C. 2025) ("[I]t appears that OMB sought to overcome a judicially imposed obstacle without actually ceasing the challenged conduct."); *Grundmann v. Trump*, 770 F. Supp. 3d 166, 171 (D.D.C. 2025) ("The Government's arguments paint with a broad brush and threaten to upend fundamental protections in our Constitution. But ours is not an autocracy; it is a system of checks and balances."); *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1033 (9th Cir. 2025) ("But such a characterization is at best disingenuous, and at worst flatly contradictory to the record."); *Rona v. Trump*, 797 F. Supp. 3d 278, 289 (S.D.N.Y. 2025) ("And regardless, Plaintiffs' First Amendment rights cannot be defeated by the Government's professions of good will."); *CASA, Inc. v. Trump*, 2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025) ("It is hard to overstate the confusion and upheaval that will accompany any implementation of the Executive Order."); *Am. Fed'n of Gov't Emps. v. U.S. Off. of Pers. Mgmt.*, 777 F. Supp. 3d 253, 281 (S.D.N.Y. 2025) ("The defendants' Kafkaesque argument to the contrary would deprive the plaintiffs of any recourse under

25-5303 (D.C. Cir. Aug. 20, 2025); *see United States v. Oregon*, No. 6:25-cv-01666-MTK, ECF 73 at 22 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").  Other courts have also previously concluded that this Administration has lost entitlement to the presumption of regularity *in the context of grand jury proceedings. See, e.g.*, *Comey*, 2025 WL 3202693, at *9 ("[T]his unusual series of events, still not fully explained by the prosecutor's declaration, calls into question the presumption of regularity generally associated with grand jury proceedings, and provides another genuine issue the defense may raise to challenge the manner in which the government obtained the indictment."); *United States v. Stewart*, 2025 WL 2754480, at *1 (D.D.C. Sept. 29, 2025) (describing federal prosecutors' conduct as "[a]t a minimum, … unseemly; more than likely it is unlawful. Not to mention, this only deepens the growing mistrust of the actions of prosecutors. That is a sentiment that was once unthinkable, but the irregular is now the regular.").

In light of the foregoing, the grand jury process in question here is not entitled to any presumption of regularity by the Court.  Likewise, it should not be afforded the traditional secrecy that accompanies grand juries operating in the normal course.

---

the law."); *Am. Fed'n of Gov't Emps. v. Trump*, 784 F. Supp. 3d 1316, 1327 (N.D. Cal. 2025) ("[D]efendants want the Court to either declare that nine Presidents and twenty-one Congresses did not properly understand the separation of powers, or ignore how the executive branch is implementing large-scale reductions in force and reorganizations."), *injunction vacated, remand granted*, 155. F.4th 1082 (9th Cir. 2025).

## CONCLUSION

For the foregoing reasons, Don R. Lemon and Georgia E. Fort respectfully request that the Court order disclosure of transcripts of all grand jury proceedings in this case, pursuant to Federal Rule of Criminal Procedure 6(e).

Dated: February 13, 2026                          Respectfully submitted,

By: *s/ Matthew S. Ebert*                          By: */s/ Abbe David Lowell*
Matthew S. Ebert                                  Abbe David Lowell (*admitted pro hac vice*)
Leita Walker                                      David A. Kolansky (*admitted pro hac vice*)
Isabella Salomão Nascimento                       Isabella M. Oishi (*admitted pro hac vice*)
BALLARD SPAHR LLP                                 LOWELL & ASSOCIATES, PLLC
2000 IDS Center                                   1250 H Street NW, Suite 250
80 South 8th Street                               Washington, DC 20005
Minneapolis, MN 55402                             Tel: 202-964-6110
Tel: (612) 371-3281                               Fax: 202-964-6116
ebertm@ballardspahr.com                           ALowellpublicoutreach@lowellandassociates.com
walkerl@ballardspahr.com                          DKolansky@lowellandassociates.com
salomaonascimentoi@ballardspahr.com               IOishi@lowellandassociates.com

Kevin C. Riach                                    */s/ Joseph H. Thompson*
THE LAW FIRM OF KEVIN C. RIACH,                   Joseph H. Thompson
PLLC                                              THOMPSON JACOBS PLLC
125 Main St. SE, Suite 339                        400 South Fourth Street, Suite 410
Minneapolis, MN 55412                             Minneapolis, MN 55416
Tel: (612) 203-8555                               Tel: (612) 416-3322
kevin@riachdefense.com                            joe@thompsonjacobs.com

*Counsel for Georgia Ellyse Fort*                 *Counsel for Don R. Lemon*