# Exhibit 18

# TRANSCRIPTS **Transcript Providers**

Shows By Category:

**Return to Transcripts main page**

## Laura Coates Live

**Journalists Arrested Over Church Protest; DOJ Releases**
**Millions of Epstein Files; Protester Speaks Out. Aired 11p-12a ET**

Aired January 30, 2026 - 23:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY
NOT BE IN ITS FINAL FORM AND MAY BE
UPDATED.


[23:00:00]

UNKNOWN: -- being so good at being American.

(LAUGHTER)

(APPLAUSE)

UNKNOWN: They're eating the dogs. They're eating the cats.

(LAUGHTER)

UNKNOWN: That's where we get our powers. That's where we get our powers.

(LAUGHTER)

(END VIDEO CLIP)

ABBY PHILLIP, CNN ANCHOR AND SENIOR POLITICAL CORRESPONDENT: You can catch more Saturday at 9 p.m. on CNN and the next day on the CNN app. Thank you very much for watching "NewsNight." "Laura Coates Live" starts right now. Have a great weekend.

LAURA COATES, CNN HOST AND SENIOR LEGAL ANALYST: Tonight, journalists arrested. The DOJ charges Don Lemon and another journalist over that St. Paul Church protest. Did the case hold any water? Plus, a CNN exclusive. The organizer of that protest speaks out for the first time since Don Lemon's arrest. Her reaction to the charges and how she is fighting the ones against herself. And the DOJ, they dropped three million pages of Epstein files. And how are victims describing it? Outrageous. One survivor joins me. Tonight on "Laura Coates Live."

All right, we all know what we got to talk about tonight, right? The arrest of former CNN anchor, Don Lemon. We've had all day -- I'm sure you've heard it -- to emotionally react. Everyone has an opinion. The group chats are full of philosophical takes on free speech and a free press. And we're going to talk about all that.

But first, I'm going to break down the indictment, what exactly is alleged in it and whether it has any merit whatsoever. And it started with a church protest in St. Paul that happened two weeks ago. Anti- ICE demonstrators interrupted a service.

Don Lemon livestreamed it so did another journalist, Georgia Fort. Now, they're both facing two federal charges, conspiring to violate someone's constitutional rights and violating the FACE Act, the law that bans force or threats that interfere with worship. And they've been released after initial court hearings.

And here's what the government is accusing them of. A -- quote -- "takeover-style attack." It alleges oppression and intimidation and threats and interference and physical obstruction. It says that shortly before the protest, Lemon explained to his audience that he was in Minnesota with an organization that was gearing up for a resistance operation. It says he thanked the protest organizer, Nekima Levy Armstrong, for what she was doing. And it says he advised his live stream audience that he was going to the operation without giving any information away.

And they allege in the indictment that his decision to tease that he knew about something, but wouldn't spill details on exactly what it was, is proof that he was somehow in on it, not a journalist with a microphone coincidentally in the right place at the right time. Now, to try to support the allegation, they point to his own show as an overt act.

(BEGIN VIDEO CLIP)

DON LEMON, JOURNALIST, FORMER CNN HOST: These are resistance protesters. They're planning an operation, and we're going to follow them on. I can't tell you exactly what they're doing, but it's called "operation pullup." How are you?

NEKIMA LEVY ARMSTRONG, ACTIVIST: Good.

LEMON: Good to see you. We're on. We're not saying what it is, what's going on, but thank you. Tell us why you're doing this.

ARMSTRONG: So --

LEMON: This is Nekima Levy Armstrong. OK. So, we're going to go to the operation again. We're not going to give any -- any of the information away.

(END VIDEO CLIP)

COATES: This indictment then lists off what happened once Lemon and the protesters got to the church. And again, we see what happened because it was on camera, right? The DOJ claims that Lemon and Fort and another co-defendant approached the pastor and -- quote -- "largely surrounded him in an attempt to oppress and intimidate him."

Take a look. This is Lemon speaking with the pastor. Now, you hear him talking about freedom of speech. And given the First Amendment and freedom of press, here is what you would have to analyze and how you would do so if you really wanted to indict the case, which we know there is one. And remember, an indictment is not the conviction. For that, I'd have to prove beyond reasonable doubt all that I'm alleging.

But for an indictment, I just have to show probable cause that you probably caused this crime to happen. You'd have to show in that that he posed as a journalist for pretext and cover, that he wasn't acting as a member of the press observing or documenting or reporting or interviewing, that he wasn't following the story. You'd have to show that he conspired to create the story, almost throw an object and hide his hands behind a press badge. You would have to show that this was different from a journalist getting a tip that something is happening and following the lead where it leads.

None of that would be light work. At an indictment stage, hearsay, that would suffice. At a trial, it better be admissible evidence and statements and corroborated and how.

[23:05:00]

Now, a jury would then have to weigh statements that fall outside the scope of first-hand observation with stated opinions and determine whether the reporter's shoe still fits. And none of this would be in a vacuum. Remember, if there is a trial, the jury would get instructions. And one of them, don't leave your common sense at the door.

Well, we know that there has already been a finding of probable cause because even when a magistrate judge shut down the first attempt to arrest him for what they called a lack of evidence, federal prosecutors went to a grand jury, probable cause in Minnesota, and they got an indictment. Now, that could be the political end game.

But the legal end game, Attorney General Pam Bondi boasted all about it. And the official White House account posted this image, writing, when life gives you lemons. Now, we know more than two dozen federal agents showed up to arrest Lemon. And he says he ain't backing down.

(BEGIN VIDEO CLIP)

LEMON: I've spent my entire career covering the news. I will not stop now. In fact, there is no more important time than right now, this very moment, for a free and independent media that shines a light on the truth and holds those in power accountable. Again, I will not stop now. I will not stop ever. I will not be silenced. I look forward to my day in court.

(END VIDEO CLIP)

COATES: And Georgia Fort, she hit the record button when officers showed up outside her house.

(BEGIN VIDEO CLIP)

GEORGIA FORT, JOURNALIST: You guys, I wanted to alert the public that agents are at my door right now. This is all stemming from the fact that I filmed a protest as a member of the media.

(END VIDEO CLIP)

COATES: And here is what she's telling CNN tonight.

(BEGIN VIDEO CLIP) FORT: I needed the world to see that journalism is on trial, that we are at a state in our nation where if you are documenting what's happening, you may be criminalized for it, you may be arrested.

(END VIDEO CLIP)

COATES: Now, the lens in which you look at that, different. Grand jury versus a trial jury. But here in this show, we're going to break down how the law could actually play out. I've got the former assistant U.S. attorney in D.C., Greg Rosen, and bringing the political lens to the conversation, joie de vivre (ph), I might add, New York Times journalist Lulu Garcia-Navarro. Good to have both of you guys here. I want both of your perspectives. Prepare for your brains to be picked. Greg, you have read the indictment. What hurdles do you see for proving this beyond a reasonable doubt?

GREG ROSEN, FORMER ASSISTANT U.S. ATTORNEY, DISTRICT OF COLUMBIA: I mean, many. So, step back, right? You already pointed out an indictment just requires probable cause. In this particular instance, the charges that Mr. Lemon and the other protesters face are specific intent crimes. In other words, the government has to prove beyond a reasonable doubt that they had the specific intent to interfere.

And in some instances, in the civil rights deprivation charge, which is one of the felony offenses, there's two charges, in the civil rights charge, they have to show actual threats, harassment, intimidation.

And I think that the indictment arguably speaks for itself in terms of how the department has crafted the narrative, but actually finding evidence that matches with that language is going to be difficult. I think you pointed out, for example, one aspect where it says they -- quote -- "largely surrounded." Those words are doing a lot of heavy lifting.

COATES: Well, Lulu, do the lifting that the White House is doing because they have been very clear about their disdain toward Don Lemon and, frankly, the protests more broadly. He has said that he is a member of the press, that he was not a part of the protest. He has been accused of that nonetheless. They touted his arrest on social media. Politically, what do they gain from this?

LULU GARCIA-NAVARRO, CNN CONTRIBUTOR, JOURNALIST FOR THE NEW YORK TIMES, PODCAST HOST: Well, what we know at this point is that Donald Trump wants this DOJ to target his

opponents. We've seen this happening over and over and over again. And the history between Don Lemon and Donald J. Trump is long and extensive. And I think you probably know better than I do, you know, Don Lemon, on CNN and now after his time at CNN, has very vocally become a critic of Donald Trump and Donald Trump has become a critic of Don Lemon.

And so, you know, this is part and parcel of this broader broadside against the perceived enemies of Donald Trump, and the DOJ is basically weaponized at this point against those perceived enemies. And I think if we understand it in that context, we can understand what's going on in Donald Trump's mind. The bigger problem here is, of course, when you go after a journalist.

[23:09:59]

This is, you know, one of the most sort of sacred things in the Constitution, freedom of the press. This is really the founding bedrock of this democracy. It just has a much wider context. And we've seen, again, this administration goes after journalists.

COATES: Well, talk about that wider context, Greg, because you prosecuted January 6 cases. And in some of those cases, people said, oh, I'm a journalist, I was inside as a journalist only now. For many, people thought that belied the actual truth of why they were there. But how does that play out in the definition that, frankly, has expanded on who is a journalist in today's world?

ROSEN: So, I think the irony here is that being a journalist doesn't exculpate you from potentially a criminal offense, right? If you are a journalist and you engage in a criminal action, for example, a journalist who goes and commits a bank robbery, they're going to be held accountable for the bank robbery.

When it comes to the line of being a journalist between passively observing or documenting history versus affirmatively getting involved in it and becoming that story, as you talked about, that is sort of the line about how DOJ uses its discretion.

So, in the January 6th context, we had individuals who claimed to be journalists. What we did was not look to see what outlet they belonged to or what they sort of thought or believed. We looked at what they did. We looked to whether we can prove their knowledge, their intent, and their actions, and whether that knowledge and intent and actions conformed with the elements of the offense. That is something that I think is largely lacking here.

COATES: Politically, this conversation plays out in other ways, right? In terms of who -- I remember when this iteration of the administration decided who would be allowed into the press briefing rooms. There was a conversation about who was a true journalist.

GARCIA-NAVARRO: I mean, we are at a moment now where I think, for the public writ large, it is very difficult to understand what is a journalist. What is a citizen journalist? Who has the legitimate right to go and be in places? Who gets the protection of the freedom of the press when they are trying to get facts? And this is, I think, a very fungible territory.

But Don Lemon is not one of those people. I mean, Don Lemon isn't sort of someone who pops up, has a video camera, and nobody really knows what outlet he's working for or he's just sort of broadcasting on his own sort of channel. This is a man with a very extensive history of being a legitimate journalist.

COATES: Is Georgia Fort different to you then?

GARCIA-NAVARRO: What? COATES: Is Georgia Fort --

GARCIA-NAVARRO: No. I don't think she's different to me either. You know, the fact is that journalists can be partisan. Journalists can have -- citizen journalists can broadcast in outlets that aren't traditional outlets, of course. But I think the point that you make is what is their intent there. Are they documenting? Are they acting as simply bystanders to what is happening there, asking questions, or are they actually being involved in what is happening? Are they going along and actually trying to foment things?

If I'm going to a protest, there's a difference between me going to a protest and sitting there and talking to people and recording it and, you know, seeing what's going on. I've been on raids. I've been on, you know, with the U.S. military, all sorts of things. And I don't disclose where I'm going. I know in advance that things are happening, and I'm going there literally to be in the service of the viewer or the audience.

COATES: Yes.

GARCIA-NAVARRO: There's a difference, right? There's just a difference than doing that than then going and saying like, I'm in there, I'm going to, you know, be part of this, and I'm part of the action. It's just two different things.

COATES: Greg, we've both been prosecutors. Going on a ride along doesn't make us cops. But if notable,

who's actually prosecuting this case? You political appointees, not career prosecutors, who are on this indictment. Actually, Attorney General Pam Bondi released a video statement. Listen.

(BEGIN VIDEO CLIP)

PAM BONDI, UNITED STATES ATTORNEY GENERAL: Make no mistake, under President Trump's leadership and this administration, you have the right to worship freely and safely. And if I haven't been clear already, if you violate that sacred right, we are coming after you.

(END VIDEO CLIP)

COATES: I've never seen this before, of an A.G. making sort of statement like this. Does it surprise you?

ROSEN: At this point, nothing surprises me. But, I mean, they opened this investigation into what happened at this church which, again, you can have legitimate feelings about whether it was proper or not --

COATES: Of course.

ROSEN: -- but they had -- they opened this investigation quicker than they did when an American citizen was shot and killed on video. And I think it is very telling as to what the priorities of the department are right now.

COATES: To that end, Todd Blanche, deputy attorney general number two, he announced today a civil rights probe into Alex Pretti's deadly shooting, as you know. When he was pressed on the killing of Renee Good, he says, well, it depends. Listen.

(BEGIN VIDEO CLIP)

UNKNOWN (voice-over): I want to clarify your remarks on the Alex Pretti killing. Are you saying that the Justice Department has opened a civil rights investigation into his death?

TODD BLANCHE, UNITED STATES DEPUTY ATTORNEY GENERAL: Yes. I expect the civil rights division here at Maine Justice (ph) will be part of that effort.

[23:15:00]

But I don't -- I don't want to overstate what's happening. I don't want the takeaway to be that there's some massive civil rights investigation that's happening.

(END VIDEO CLIP)

COATES: So, lawyers manage expectations. But that's a hell of a management. What do you see there?

GARCIA-NAVARRO: Yes. I mean, I definitely see -- I mean, it's hard to know, right? What's happening inside the DOJ. But what I see there is someone performatively saying that they're going to be investigating something without really doing the real work of an independent investigation.

I mean, let's not forget here that at no point have the federal authorities worked with state or local police on this at all. And that is sort of unprecedented. The first thing that should have happened is to really have a joint investigation or at least an independent investigation. And so, I think what they're doing there is really trying to cover their butts.

COATES: You don't devote the resources. You undermine the ability to mount your case. Greg, Lulu, thank you so much. Still ahead, the woman charged with being at the center of the alleged conspiracy to enter that church. Nekima Levy Armstrong will join me for her first interview since Don Lemon's arrest. Plus, the DOJ claiming their job is done after releasing three million pages from the Jeffrey Epstein files. So, what did we learn and why are survivors so upset with the DOJ tonight? You're going to hear from one of them right here, next.

(COMMERCIAL BREAK)

[23:20:00]

(COMMERCIAL BREAK)

COATES: Well, over a month late and after failing to meet its deadline mandated by federal law, the DOJ is releasing more than three million pages of documents and videos in the Jeffrey Epstein investigation. Now, CNN is still combing through the trove. In a moment, we'll hear from an Epstein survivor and an attorney representing others.

But here's some of what we've learned so far. A draft indictment from the 2000s included alleged co-conspirators. Remember, only one co- conspirator was charged, Ghislaine Maxwell. Now, the current DOJ

compiled a list of unverified allegations and tips against President Trump. The president has long denied any wrongdoing, as you know. An undated diagram lays out Epstein's inner circle. But some of his close associates, well, they're blacked out, which begs the question, why? More importantly, the files underscore the horrors that countless Epstein survivors experienced. And the Department of Justice claims it has no knowledge of who else was involved.

(BEGIN VIDEO CLIP)

BLANCHE: I don't know whether there are men out there that abuse these women. If we learn about information and evidence that allows us to prosecute them, you better believe we will. But I don't think that the public or you all are going to uncover men within the Epstein files that abuse women, unfortunately.

(END VIDEO CLIP)

COATES: With me now, an Epstein survivor who says she was just 14 years old when she met him. Marina Lacerda was identified as minor victim one in the 2019 federal indictment against Epstein. An attorney for Epstein survivors, Spencer Kuvin, is also joining the conversation.

Marina, you and I have talked many times now on this show, and I want to begin with you. The Department of Justice thinks that you won't likely find in these files the names of the Epstein associates who engaged in the sexual abuse. What is your response to that?

MARINA LACERDA, EPSTEIN SURVIVOR: Laura, you know, we've had so many different interviews, and I think today is the most saddening, deeply upsetting, heartbroken day that we have experienced as survivors. I can't help but wonder why the DOJ has once again failed us. Again, it feels like they're ignoring our need for protection, especially when they've taken this time to redact the names of powerful individuals like you said, but not ours. This double standard makes it even harder for us to trust them.

When I read those six pages of allegations that mentions our president and a lot of other prominent people, my heart just immediately stopped. Immediately. Immediately. And it brings me to say because Todd Blanche said we would not find anything. And I'm not saying that President Trump is -- you know, these accusations are real, but is the DOJ going to step up and investigate this? Because these are serious allegations. And if we can't turn to the government to help us and the DOJ, then who will?

COATES: Marina, multiple survivor names were not redacted in the files that DOJ released today. Did any of

this impact you directly?

LACERDA: A hundred percent. And, you know, I have to say not only our names were not redacted, but there are personal information out there that can hurt us. It is our -- there's addresses, there's IDs, there's phone numbers that connect us to now in the future, and that is very dangerous for us who have been speaking. And some of the Jane Doe survivors who have not spoken, their names are out there, not redacted.

[23:25:03]

And then we have these powerful rich men who are getting all these redactions. We are -- we are in so loss of words. We don't know what else to expect from the DOJ at this point.

COATES: Spencer, let me bring you in because everyone is still going through the files, but I wonder what your assessment is so far of what they have actually released. Does it make you feel any less or more confident that they have been thorough and exhaustive in their review?

SPENCER KUVIN, ATTORNEY FOR JEFFREY EPSTEIN VICTIMS: Not in the least. I mean, sadly, you know, I've been representing survivors now for about 20 years, and we have known for years that the federal government has had volumes and volumes of information, and they have barely scratched the surface in releasing the documents that they have under their custody.

I've been fighting for years now for them to release the videos that they have. They have internal surveillance videos taken from inside of Epstein's homes. There are hundreds of hours of videos that the DOJ is just sitting on and fail to release.

You know, we've been demanding that Congress get back to work and amend the statute to provide for a private right of action against the DOJ because they clearly cannot be trusted, as we've seen, because they violated a direct federal statute by refusing to release this information in a timely way that the statute required.

COATES: Spencer, the number two at the DOJ, Deputy A.G. Todd Blanche, is insisting that the DOJ, his quote, did not protect President Trump. Is that how you see it?

KUVIN: No. That's completely absurd. We know that they were protecting President Trump because they withheld all this information. And we only saw the release of the allegations that were voluminous right now against Trump today when that release of documents came forward and we saw the interviews that they had

done.

I can tell you that from the beginning of these cases, when I represented Jane Doe One in the Epstein case, you know, Epstein's defense to that case were she's lying, she just is after my money. Well, once, literally tens, and then eventually hundreds of girls came forward. Then the avalanche of evidence really started building up, that that defense just didn't hold water. You know, all victims are lying defense doesn't really hold water when you see so many young girls that are coming forward. And we're now seeing that in the allegations that are coming forward against Trump.

COATES: Marina, the Department of Justice suggests that this is likely the final release of the files they have. Congressman Ro Khanna says that nearly 2.5. million files have still not been released yet. So, what now?

LACERDA: Well, it's what we wonder. Why are they holding back 2.5 million files? They say it is client privilege, you know. I guess they're medical records that they can't release. But I highly doubt that 2.5 million records -- I'm sorry -- files are just, you know, client privilege rights and medical records. I feel there's more to it.

When I come to see some of my files, I see some of the things that are missing there. There's a lot of information that just doesn't make sense and doesn't add up. And it seems like they have skipped some of the years that they put in there. And there's nobody that we can contact.

And I absolutely love how Todd Blanche said that we can communicate with the DOJ. That is not true. We've tried to talk to them. We've tried to, you know, communicate with them because communication is the key here, right? And I think that the people that they need to communicate with -- to communicate with is us. And they have not even tried to talk to us. And I think, honestly, that they're just scared.

COATES: I know that you have not felt seen. We have talked about it. And today, my heart sinks that you feel that way even now. Marina Lacerda, Spencer Kuvin, thank you both.

KUVIN: Thank you.

COATES: Up next, a "Laura Coates Live" exclusive. An organizer of the anti-ICE protests inside the Minnesota church speaking out for the first time since Don Lemon's arrest. DOJ charging her, alleging a conspiracy that involved Don Lemon and other journalists. Nekima Levy Armstrong live to respond to it all, next.

(COMMERCIAL BREAK)

[23:30:00]

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

ARMSTRONG: -- pretend to be a house of God while harboring someone who is directing ICE agents to wreak havoc upon our community, and who killed Renee Good, who almost killed a six-month-old baby. Enough is enough!

(END VIDEO CLIP)

COATES: That was Don Lemon interviewing one of the organizers of the protest at a Minnesota church as the event was unfolding, Nekima Levy Armstrong. And tonight, she and Lemon are co-defendants in the federal case against those protesters. Lemon says that he was there in his capacity as a journalist. And Armstrong says the protest was nonviolent and lawful dissent, calling the charges against her "trumped up."

[23:35:03]

But today, prosecutors allege these comments that Armstrong told Lemon before they entered the church constitute an overt act of a conspiracy.

(BEGIN VIDEO CLIP)

ARMSTRONG: We protest and do activism in all kinds of ways. This is "operation pullup," more of a clandestine operation. We show up somewhere that is a key location. They don't expect us to come there. And then we disrupt business as usual. So, that's what we're about to go do right now.

(END VIDEO CLIP)

COATES: Nekima Levy Armstrong joins me now. She's also the former president of the Minneapolis NAACP. Nekima, good to see you again. I am curious about your reaction to the fact that the DOJ is alleging that you

and Don Lemon were part of a conspiracy to, their words, threaten and intimidate the people in that church. So, I want to ask you point blank, did you coordinate with Don Lemon or Georgia Fort to be involved in this protest?

ARMSTRONG: Hi, Laura. Absolutely not. As you can see, as the world can see, both Don Lemon and Georgia Fort were there as independent journalists documenting the protest. They're not organizers, they're not activists, they're not protesters.

Beyond that, we know that the Department of Justice is not credible, as we just heard from the last segment regarding the Epstein files. And this is a healthy distraction from a president who has 34 felonies, who has been accused of rape, who we know lies to the public, and who looks for distractions and ways to target people who speak out against his authoritarian regime.

So, that is what this is about at the end of the day. We went to the church, we raised specific concerns about ICE pastor David Easterwood serving as a dual role as a pastor at city's church while also serving as the director of the ICE office in Minnesota, condoning the behavior of ICE agents who've wreaked havoc upon the streets of Minneapolis, upon our families, and upon our communities. The truth needed to be spoken. And Don and Georgia were there to document it as journalists should.

COATES: So, it was your understanding that both Don Lemon and Georgia Fort were only accompanying you as journalists to observe?

ARMSTRONG: Absolutely. I mean, that should be obvious for anyone. Like I said, the DOJ is not credible. The White House isn't credible. Donald Trump isn't credible. So, what are we really talking about here? We need to keep the main thing the main thing, and that is the harm that ICE is causing in the state of Minnesota through their unlawful and unconstitutional actions.

COATES: The indictment alleges that congregants -- quote -- "fled the church building out of fear for their safety as a result of this incident." I actually want you to listen to something that Don Lemon reported in his video. OK?

(BEGIN VIDEO CLIP)

LEMON (voice-over): So, this is what the First Amendment is about, about the freedom to protest. I'm sure people here don't like it, but protests are not comfortable. And there are people here who are -- I'm looking at a

young man who's in the corner, he's frightened, he's scared, he's crying. People are leaving church.

(END VIDEO CLIP)

COATES: So, how do you respond, Nekima, to the claims that based on what he's observing, that there was intimidation, that it did scare people? Does that somehow change what your mission was?

ARMSTRONG: Laura, you just showed a video. Did you see people fleeing the church or did you see their -- see them sitting there calmly looking? There were also parishioners engaging protesters to learn about David Easterwood because they weren't -- many of them weren't aware that he is the director of ICE for Minnesota. So, you just showed a video. Look at -- look at these people. Do you see them fleeing? Do you see them looking terrified or are they just sitting there watching our protests and hearing what we're saying?

COATES: I'm only going by what Don was reporting, which I think is the interesting aspect of what will be used, obviously, in the allegations that they are suggesting to support a criminal indictment.

Let me ask you. I want to go back for one second, though, because the core of the indictment suggests that because there was knowledge of a clandestine, your words, operation, but the details were not going to be provided during the live stream, that suggests that there was a coordination and a pre-planned meeting with Don or Georgia and others. Were they a part of a conversation where they had advanced knowledge of your intentions for the protest? Were they involved in the coordination, planning or execution of any of it?

[23:40:01]

ARMSTRONG: So, as I said in the beginning, neither Don nor Georgia are activists, protesters or organizers in any way, shape or form.

COATES: OK.

ARMSTRONG: So, as I said during the video, it was a clandestine operation which meant no one other than the organizers had any information about where we were even going. I gave out the address right before we left. And I told them, I'm not answering any more questions. When we get there, you'll see where we are. They had no details. They didn't know about David Easterwood. They didn't know what was going to happen once we actually got to the location.

And I waited to hear the prayer from the pastor. And in my spirit, that was my cue to stand up and question him in regards to his prayer. And then I questioned him about David Easterwood. And he responded when I asked that initial question. And after I mentioned David Easterwood, that's when the pastor started saying, shame, shame, because he didn't want the congregation to hear a conversation about David Easterwood's dual role.

So, at that point, then I started leading a chant, justice for Renee Good. And after we did that chant, then I said, hands up, don't shoot, to let them know, like, we're here in peace. We didn't know if there were ICE agents or federal agents in the audience --

COATES: OK.

ARMSTRONG: -- knowing that there's an ICE pastor who is a part of the church.

COATES: OK.

ARMSTRONG: So that is how things unfolded. Don and Georgia had no advanced knowledge. They had to show up like everyone else at the Cub Foods parking lot, which was on the flyer, and learn the address at the last second before we all got in our vehicles and drove there.

So, they did what journalists do, which is to document. They did absolutely nothing wrong. And if you've read the indictment, you see that it's a very flimsy indictment. They're exaggerating facts. You see that what you saw in the video doesn't match a lot of what they have written in this documentation.

Who they need to be focused on are the people in our community who are being harmed by ICE. Those are the families with children who are terrified, who are seeing their families being kidnapped, seeing their family being dragged through the streets. That is the crime here, not peaceful protesters going into a church speaking the truth.

COATES: Nekima Levy Armstrong, we'll leave it there. Thank you. Up next, the government set to partially shut down at midnight as Democrats and Republicans gear up for a major fight over ICE funding. Congressman Eric Swalwell standing by to lay out his party's demands. Plus, the DOJ's new offer to members of Congress who are skeptical about the release of the Epstein files, next.

(COMMERCIAL BREAK)

[23:45:00]

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

BLANCHE: -- and to ensure transparency. If any member of Congress wishes to review any portions of the response to production and any unredacted form, they're welcome to make arrangement with the department to do so, and we're -- we're happy to do that.

(END VIDEO CLIP)

COATES: Deputy A.G. Todd Blanche with an open invite to members of Congress to come, look at the unredacted Epstein files. And Blanche's assessment, it is now case closed after this last batch of three million pages. Now, DOJ says it is now done with the matter. No more reviews of documents are planned. I wonder how it's going to go over on Capitol Hill.

Joining me now is Democratic congressman from California, Eric Swalwell, serving on both the judiciary and homeland security committees. He's also running for governor in California. Congressman, glad you're here. Let me ask you if you'll be taking up Todd Blanche's offer to go look at these unredacted files.

REP. ERIC SWALWELL (D-CA): I will and working my way through, you know, what has been redacted. But, you know, you don't have to have a child to know that we have to protect our kids from these kinds of whores. But if you have children, especially a daughter like I have, a little seven-year-old girl, you'll never stop fighting until you get the justice that you want for these girls.

But as I've looked through what has been released, it's just a reminder that while Donald Trump has done so many horrific things and more and more every day, that some have probably forgotten that our own president was not only best friends with this monster, Jeffrey Epstein, the most notorious child sex predator ever, but is accused now of what has been put out today, accused now of looking more and more like Epstein than we imagined.

COATES: Of course, he does not say they had that close relationship. And I know you're pointing out the word "accused" because the presumption of innocence and he has not been charged with a crime. But there were a lot of questions as to whether the release of these files would potentially lead to others being held accountable.

Actually, Todd Blanche, today, he made it seem like there's nothing for DOJ to pursue further. Do you agree?

SWALWELL: I agree they won't pursue this any further. I don't agree that they should not pursue this any further. However, you have in the House of Representatives a mandate. Almost every member of Congress voted to have these files released. And you have an investigation that is underway. And if that investigation is serious, you know, led by James Comer, then he would bring the president in for questioning.

And so, my question to James Comer is, there's no individual who has mentioned more than I've seen in the Epstein files than Donald Trump, so why wouldn't you want to hear from Donald Trump and put any questions you may have about his involvement to rest?

COATES: Well, I mean, the House, as you mentioned, is coming back Monday, take up this very deal the Senate passed today to fund DHS for two weeks to avoid a shutdown. You'll have conversations during that time about the Epstein files as well. But I know you have been against ICE getting any more money.

[23:49:59]

Congressman, will you support this measure to allow for more time to negotiate? SWALWELL: No.

(LAUGHTER)

You know, more time to negotiate means that we will lose another mom named Good and another nurse named Pretti. I want ICE stopped right now. I want the robing patrols to stop. I want the targeting of non- criminals to stop. I want the masked operations to stop. And so, I just can't justify more, you know, public executions from ICE. And so, I will not be voting to give them any more time.

COATES: I mean, I've seen Democrats make a long list of demands to reform ICE. But tell me what are the priorities that you think you can actually get Republicans to agree on.

SWALWELL: It's what we all signed up for the last election. And after Donald Trump was elected, I said, I support, you know, security at the border, I support finding the most violent individuals in our community who are, you know, here undocumented and making sure that we get rid of them.

But that's not what's happening. They're dragging women by their hair through our streets, a six-year-old child battling stage four cancer has been deported, farmers being chased through the fields where they work. No one

-- no one asked for this.

And if they go back to what they promised they would do, they would have the support of the public. And until they do that, they're not getting my vote and they're not getting a penny from me.

COATES: You've been vocal that you want ICE agents to not be able to wear masks. You have Republicans, though, who say that in the climate that we're in, it would put ICE agents in danger to reveal themselves. Why do you say -- what do you say to your Republican colleagues when they say that?

SWALWELL: I say that's nonsense. I'm the son of a cop, a brother to cops, and I was a prosecutor. And this is not how law enforcement operates in our community. And when they're at their best, they've built trust with the community. They have buy-in from the community that what they are doing is just and protects people. And right now, they are killing more people than they have protected. And so, we can't do enough federally to rein that in.

But I also think governors have to be strong. Governors have emergency powers they can use. They can go after their driver's licenses if they're wearing masks. They have the ability in their states to say, you're not hirable in our states if you have worked for ICE and you've made decision to keep operating this way.

So, it's going to be democratic House in November that can put in place some of these reforms but also, it's going to be rock-strong governors. That's in part why I'm running in California, to make sure that we're always on offense and the most vulnerable are never on defense.

COATES: Would you have support for the proposition that you could punish somebody for their federal service based on the mask wearing?

SWALWELL: Yes. And I talked to law enforcement officers, by the way, and they say, this is not what we do. The FBI doesn't operate this way. Local law enforcement doesn't operate in this way. But it's really a support from women who are telling me, as I've gotten across the state, that any person wearing a mask could pull up and throw them into a van, and they don't know if they're ICE or if it's, you know, somebody kidnapping them. That doesn't sound like keeping people safe.

COATES: I wonder if that will transfer across the board and law enforcement for anyone's undercover. I have my doubts. Congressman --

SWALWELL: And in cases justified, but not roving patrols just looking for people based on the color of their skin and, you know, the accent that they may have, which is what they're doing right now.

COATES: Deputy Attorney General Todd Blanche, during his press conference, said that there is a civil rights investigation into Alex Pretti's killing, but he didn't say there will be one in Renee Good's killing, and he really wasn't that explanatory in the rest. But why do you think they're being selective in choosing one over the other?

SWALWELL: They should seek prosecution in both. You know, just -- just like they told us January 6th didn't happen. They're telling us that they were justified in what they did. But the problem for them is that they can put as many lies into our ears as they want, but they can't shove it into our eyes. We saw these murders in 4K. And people are not going away. People are going to the streets. And the public pressure, I want to tell your viewers, is working.

Donald Trump's Achilles heels is he does not want to be unpopular. And when he sees the public sentiment turned against him, he turns rather fast and throws everyone else under the bus.

And so, the louder we are, the more places and spaces that we go. In the town square, I promise you, we will see real reform, and senators and members of the House will get the message that this can no longer be fun.

COATES: Congressman Eric Swalwell, thank you for joining.

SWALWELL: My pleasure. Thanks, Laura.

COATES: We're going to be right back with a special tribute to the late Catherine O'Hara.

(BEGIN VIDEO CLIP)

(MUSIC PLAYING)

(LAUGHTER)

(MUSIC PLAYING)

[23:55:00]

(END VIDEO CLIP)

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

CATHERINE O'HARA, ACTRESS: (INAUDIBLE).

UNKNOWN: What?

(LAUGHTER)

O'HARA: (INAUDIBLE)

(END VIDEO CLIP)

COATES: From that classic moment in "Home Alone" to singing "Day-O" in "Beetlejuice," to her iconic turn as Moira Rose in "Schitt's Creek," it is hard to think of a scene where Catherine O'Hara didn't leave you smiling. She passed away today at just 71 years old after an illness. "Home Alone" co-star Macaulay Culkin posting, mama, I thought we had time, I had so much more to say.

Elex Michaelson joins me now from Los Angeles. I mean, she was in just so many of my favorites. Best in show, just to name one. Always makes you smile, let alone "Schitt's Creek." What was your personal favorite?

[00:00:01]

ELEX MICHAELSON, CNN ANCHOR AND CORRESPONDENT: Well, "Home Alone" was my favorite movie as a kid, so I love that. But there's nothing quite like Moira Rose. The outfits, the accent, the whole thing. And she was so outrageous yet so lovable and human in the most over the top farcical job that there is. And so, I mean, so much love for Catherine O'Hara. And she's great in the studio, too, which just came out last year, which she was nominated for an Emmy for.

COATES: Oh, my God. Well, we still love her. And we love your show. It's coming up, Elex.

MICHAELSON: Have a great weekend, Laura.